**Views of the Commission on Remand**

By decision and order dated October 12, 2023, the U.S. Court of International Trade remanded the Commission's determinations regarding Russia in the final S*eamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe* ("SSLP pipe" or "SSLPP") investigations, as set out in *SSLP Pipe from Czech Republic (Czechia)*, Inv. No. 731-TA-1529 (Final), USITC Pub. No. 5183 (Apr. 2021) ("Leading Views"), and *SSLP Pipe from Korea, Russia, and Ukraine*, Inv. Nos. 701-TA-654-655 and 731-TA-1530-1532 (Final), USITC Pub. No. 5222 (Aug. 2021) ("Trailing Views").[1] Upon consideration of the remand order and based on the evidence in the record of these investigations, the Commission determines again that an industry in the United States is materially injured by reason of imports of SSLPP from Russia that are sold in the United States at less than fair value ("LTFV") and subsidized by the government of Russia.

**I.    BACKGROUND**

In April 2021, the Commission unanimously determined that a domestic industry was materially injured by reason of the subject imports from Czechia found by Commerce to be sold

---

[1] *PAO TMK v. United States*, Court No. 21-00532, Slip Op. 23-150 at 9-11 (Ct. Int'l Trade Oct. 12, 2023) ("Slip Op. 23-150").  Although the petitions for the antidumping and countervailing duty investigations on SSLPP from Czechia, Korea, Russia, and Ukraine were filed on the same day, July 8, 2020, the investigation schedules became staggered when the U.S. Department of Commerce did not align its countervailing and antidumping duty investigations.  The Commission issued separate publications for its final antidumping duty investigation of SSLPP imports from Czechia ("Leading" Views) and its final antidumping and countervailing duty investigations of SSLPP from Korea, Russia, and Ukraine ("Trailing" Views).  *See* Leading Views, USITC Pub. 5183; Trailing Views, USITC Pub. 5222 at 3.  In the Trailing Views, the Commission adopted its findings and analyses from the Leading Views with respect to issues concerning the domestic like product, domestic industry, negligibility, cumulation, conditions of competition, volume, price, and impact.  Trailing Views*,* USITC Pub. 5222 at 6.  Accordingly, Plaintiffs' challenge to the negligibility findings were, for the most part, originally made in the antidumping investigation of SSLPP from Czechia and incorporated by reference into the trailing antidumping and countervailing duty investigations for Russia and other countries.

in the United States at LTFV.[2]  Subsequently, in August 2021, the Commission unanimously determined that the domestic industry was materially injured by reason of subject imports from Korea, Russia, and Ukraine found by Commerce to be sold in the United States at LTFV and found by Commerce to be subsidized by the governments of Korea and Russia.[3]

Respondent PAO TMK ("TMK"), a foreign producer and exporter of SSLPP from Russia appealed the Commission's final affirmative injury determinations concerning SSLPP from Russia.[4]  Specifically, TMK challenged the Commission's finding that subject imports from Russia were not negligible.[5]  TMK did not challenge the actual volume of subject imports from Russia, but challenged on various grounds the Commission's methodology for determining the total volume of SSLPP imports from all countries that provided the denominator for the negligibility calculation.[6]  In TMK's view, the Commission's methodology resulted in the undercounting of total imports matching the scope of these investigations.[7]

On October 12, 2023, the court issued an opinion and order, affirming in part and remanding in part the Commission's determinations.  In particular, the court sustained the Commission's methodology for measuring imports from Ukraine and from All Other sources (*e.g.,* Argentina and Italy).[8]  The court remanded the Commission's calculations of imports from Germany and Mexico for further consideration and explanation.

---

[2] Leading Views, USITC Pub. 5183 at 25.
[3] Trailing Views, USITC Pub. 5222 at 7.
[4] Slip Op. 23-150; s*ee* Summons filed in United States Court of International Trade by Plaintiff (Sept. 21, 2021) ("Summons").
[5] TMK's rule 56.2 brief (Oct. 21, 2021) at 2.
[6] TMK's rule 56.2 brief (Oct. 21, 2021) at 14-41.
[7] TMK's rule 56.2 brief (Oct. 21, 2021) at 10-11.
[8] Slip Op. 23-150 at 11-12.

On November 7, 2023, the Commission published notice of its remand proceedings in the Federal Register.[9] In the notice, the Commission stated that it was not reopening the record, but invited parties to file comments concerning how the Commission could best comply with the court's remand instructions.[10] On December 1, 2023, TMK filed remand comments, as did Domestic Producers United States Steel Corporation ("US Steel") and Vallourec Star, LP ("Vallourec").

## II.  ADOPTION OF FINDINGS FROM OUR ORIGINAL DETERMINATIONS

We have considered the record as a whole in light of the court's remand instructions. The Commission observes that it is adopting its original findings, analysis, and conclusions in their entirety with respect to those issues either affirmed by the court or not subject to appeal, including domestic like product, domestic industry, cumulation, legal standards, conditions of competition, volume, price, and impact.

In accordance with the court's instructions, we reconsider the calculation of in-scope imports from Germany and Mexico, specifically taking into account the U.S. Customs data ("Customs data")[11] in the record and evidence proffered by TMK that [      ] (Company C) allegedly imported in-scope imports from Germany.

---

[9] *Notice of Remand Proceedings*, 88 Fed. Reg. 76853 (November 7, 2023).
[10] *Notice of Remand Proceedings*, 88 Fed. Reg. 76853 (November 7, 2023).
[11] The court and parties interchangeably refer to the Customs Net Import File ("CNIF") data as "Customs data" or "CBP data."

### III. NEGLIGIBILITY

#### A. The Court's Instructions

First, addressing the Commission's methodology for measuring imports from Germany and Mexico, the court found that the Commission failed to address certain Customs data that TMK identified as contradicting the Commission's finding that only Company A ([      ]) imported SSLPP from Germany and that only Company B ([      ]) imported SSLPP from Mexico.[12]  Accordingly, the court ordered the Commission to "reconsider its calculation of in-scope imports from Germany and Mexico and its related findings that there was only one importer each for Germany and Mexico in light of Customs data to the contrary."[13]

Second, the court found that the Commission did not meaningfully address evidence proffered by TMK that purportedly casts doubt on [      ] (Company C's) initial U.S. importer questionnaire response.[14]  Specifically, the court referred to TMK's introduction of a bill of lading from Datamyne and section 232 exclusion documentation as part of TMK's effort to demonstrate that certain imports from other importers were in-scope.  The court ordered the Commission to "reconsider… its calculation of in-scope imports from Germany by [      ] (Company C) in view of evidence to the contrary proffered by TMK."[15]

#### B. Parties Arguments

##### 1. Domestic Producers

---

[12] Slip Op. 23-150 at 9.  The court rejected the Commission's argument that TMK had waived this argument, finding that TMK had no opportunity during the Commission proceeding to challenge the Commission's decision to rely, with respect to imports from Germany, only on in-scope imports reported by [      ] (Company A) in its importer questionnaire, and, with respect to Mexico, only on in-scope imports reported by [      ] (Company B) in its importer questionnaire.  *Id*.
[13] Order at 1.
[14] Slip Op. 23-150 at 10-11.
[15] Order at 1-2.

Addressing the court's first remand issue, Domestic Producers argue that Customs data do not undermine the reasonableness of the Commission's reliance on importer questionnaire responses of [      ] (Company A) and [      ] (Company B) as providing a sufficient basis for calculating in-scope imports for Germany and Mexico, respectively.[16] They assert that TMK failed to demonstrate that any company in the Customs data that did not return an importer questionnaire response in fact imported in-scope SSLPP.[17] Specifically, they explain that Customs data are based on HTS numbers that cover both in-scope and out-of-scope products, and therefore it is impossible to determine whether a company listed in the Customs data actually imported in-scope merchandise absent an importer questionnaire response.[18]

Further, Domestic Producers argue that even if TMK were able to identify reliable evidence of in-scope imports from other companies based on the Customs data for Germany and Mexico, the Customs dataset only overlaps with five months of the negligibility period, and therefore, the Commission cannot rely on imports in the Customs data itself for its negligibility calculations.[19] They conclude that nothing in the Customs data contradicts the Commission's conclusions or requires a different result, and the Commission should therefore maintain the negligibility calculation methodology from the original investigations in its remand results.[20]

Addressing the court's second instruction, Domestic Producers argue that none of the record evidence highlighted by TMK demonstrates that [      ] (Company C) imported in-

---

[16] Domestic Producers' Remand Comments at 4.
[17] Domestic Producers' Remand Comments at 7.
[18] Domestic Producers' Remand Comments at 5-6.
[19] Domestic Producers' Remand Comments at 7.
[20] Domestic Producers' Remand Comments at 8.

scope merchandise, and nothing undermines the reasonableness of the Commission's reliance on [      ] (Company C's) initial questionnaire response.[21]

They contend that the bill of lading data from Datamyne submitted by TMK does not conclusively demonstrate that [      ] (Company C) had in-scope imports. They observe that TMK itself acknowledged that "the lack of detailed descriptions on Datamyne makes it difficult to perform a full analysis."[22] Although TMK highlights two entries described as [                                                    ], Domestic Producers argue that the descriptions contain insufficient information to determine whether the imports are in-scope or not.

Domestic Producers assert that the mere fact that [      ] (Company C) filed or was granted a Section 232 exclusion request does not mean that any of the products for which exclusions were sought or granted were actually imported into the United States, and the documentation does not indicate whether the products were actually imported or when importation may have occurred.[23] Domestic Producers also note that TMK itself admitted it was not able to provide any information regarding [      ]'s (Company C's) actual usage of these exclusions.[24]

Lastly, Domestic Producers argue that TMK's contention that [      ] (Company C) imported products covered by an antidumping duty order on certain small diameter seamless carbon and alloy standard, line, and pressure pipe ("*SD SSLP*") from Germany is unavailing.

---

[21] Domestic Producers' Remand Comments at 8.
[22] Domestic Producers' Remand Comments at 9.
[23] Domestic Producers' Remand Comments at 10.
[24] Domestic Producers' Remand Comments at 10-11.

TMK's argument is premised on the assumption that the German AD order on *SD SSLP* covers the same products subject to this investigation, but within a narrower range. Domestic Producers assert that TMK failed to provide the scope language of the *SD SSLP from Germany* order or any other information or analysis supporting this conclusion. Moreover, they contend that TMK's summary of the Customs data shows that [                                            ].[25] Therefore, they argue that none of the record evidence highlighted by TMK demonstrates that [          ] (Company C) imported in-scope merchandise or calls into question the reliability of the firm's questionnaire response.[26]

### 2. Russian Respondent (TMK)

TMK argues that the Commission's determination that [          ] (Company A) and [          ] (Company B) were the only importers of SSLPP from Germany and Mexico, respectively, is contradicted by Customs data.[27] It argues that the Customs data demonstrates there are other companies that imported in-scope imports from Germany and Mexico other than [          ] (Company A) and [          ] (Company B), respectively, based on several companies importing pipe under the applicable HTS categories from Germany and Mexico.[28]

In TMK's view, the Commission should therefore calculate the in-scope imports from Mexico by subtracting [          ] (Company B's) reported out-of-scope imports from official import statistics that cover imports from Mexico under all of the primary HTS categories.[29]

---

[25] Domestic Producers' Remand Comments at 10-11.
[26] Domestic Producers' Remand Comments at 11-12.
[27] TMK's Remand Comments at 3-4.
[28] TMK's Remand Comments at 2.
[29] TMK's Remand Comments at 2-3, 9-11.

7

In addition to arguing that there is evidence that companies other than [       ] (Company A) imported in-scope product from Germany, TMK argues with respect to imports from Germany that the in-scope and out-of-scope imports reported in [       ] (Company A's) and [       ] (Company C's) initial importer questionnaire responses exceed the amount reported in official import statistics.[30]  Notwithstanding the court's holding that the Commission did not act arbitrarily in relying on Company A and Company C's initial questionnaires responses, TMK continues to argue that just as the Commission rejected [       ] (Company A) and [       ] (Company C's) revised responses for exceeding official import statistics, it should also reject their initial questionnaire responses for the same reason.[31]  Because TMK's view is that there are no reliable importer questionnaire responses of imports from Germany, it argues that the Commission should rely on unadjusted official import statistics to determine in-scope imports from Germany, consistent with the Commission's approach for measuring imports from Ukraine.[32]

TMK also argues that contrary to [       ] (Company C's) questionnaire response, record evidence show that this firm imported in-scope imports from Germany.  First, TMK claims that [       ] (Company C's) importation of in-scope imports from Germany is demonstrated by Customs data showing that [       ] (Company C) imported products under the *SD SSLP from Germany* AD order.[33]  It also argues that bill of lading data "clearly provid{es} SSLP specifications" and show [       ] (Company C) as importer of record.[34]  Further, it

---

[30] TMK's Remand Comments at 2, 5-6.
[31] TMK's Remand Comments at 2, 5-6.
[32] TMK's Remand Comments at 1-2, 7.
[33] TMK's Remand Comments at 6, Exh. 3.
[34] TMK's Remand Comments at 6-7.

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Public Version

contends that the evidence that [     ] (Company C) filed or was granted Section 232 exclusion requests indicate [     ] (Company C) imported SSLPP.[35]  It asserts that this evidence casts doubt on [     ] (Company C's) initial questionnaire response.[36]

**C.    Analysis**

The statute provides that "imports from a subject country of merchandise corresponding to a domestic like product that account for less than three percent of all such merchandise imported into the United States during the most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible."[37]  Congress recognized that the Commission "may not have access to either complete questionnaire data or official import statistics conforming exactly to the Commission's like product(s) designations,"[38] and explicitly authorized the Commission to make "reasonable estimates on the basis of available statistics" of pertinent import levels for purposes of deciding negligibility.[39]

As discussed above, the court remanded for the Commission to reconsider its calculation of in-scope imports from Germany and Mexico.[40]  In light of this instruction, we incorporate our findings, analysis, and conclusions from the original determinations concerning the calculation of in-scope imports from Russia, Czechia, Korea, Ukraine, and All Other

---

[35] TMK's Remand Comments at 7.
[36] TMK's Remand Comments at 6.
[37] 19 U.S.C. § 1677(24)(A)(i).  The exception to this three percent negligibility standard, involving the aggregate volumes of imports from several countries with negligible imports, is not at issue in this case.  *See* 19 U.S.C. § 1677(24)(A)(ii).
[38] Statement of Administrative Action ("SAA") to the Uruguay Round Agreements Act ("URAA"), H.R. Doc. No. 103-316, vol. 1, 856 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4188
[39] 19 U.S.C. § 1677(24)(C).
[40] Order at 1-2.

sources.[41]  The discussion below is limited to further explanation regarding the calculation of in-scope SSLPP imports from Germany and Mexico, and the resultant negligibility determination for subject imports from Russia.

We first respond to the court's instruction that the Commission address the Customs data showing several companies imported products under the HTS numbers[42] covered by the scope from Germany and Mexico in light of the Commission finding that [      ] (Company A) and [      ] (Company B) were the only importers of in-scope imports from Germany and Mexico, respectively.[43]  In the Leading Views, the Commission found that [      ] (Company A) was the only reported importer of in-scope SSLPP from Germany.  Consistent with this finding, the Commission relied on [      ] (Company A's) reported imports of in-scope products from Germany as the best information available for measuring the volume of SSLPP from Germany.[44]  The Commission also observed that [      ] (Company B) reported in its brief that [                                                                                         ].  In light of this information, the Commission found that reported imports of in-scope SSLPP from

---

[41] The Commission calculated negligibility using official import statistics to measure in-scope SSLPP imports from Czechia, Korea, and Ukraine, adjusted official import statistics that subtracted out-of-scope imports reported in the importer questionnaires to measure imports for the All Other category of sources, and in-scope imports reported in the importer questionnaires to measure in-scope SSLPP imports from Russia. Trailing Views, USITC Pub. 5222; Supplemental Confidential Report, INV-TT-091 (July 23, 2021) ("Supplemental CR") at Table I-6; Supplemental Public Report, ("Supplemental PR") at Table I-6.

[42] "HTS numbers" refers to the HTS 10-digit statistical reporting numbers listed in the scope of the investigations.  Within the scope of the investigations, the HTS numbers are provided for convenience and customs purposes and the written description is dispositive.  In this case the HTS numbers listed correspond to a broader range of products than the scope as specified in the written description. Leading Views, USITC Pub. 5183; Confidential Report ("CR") at I-10; Public Report ("PR") at I-10; *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea, the Russian Federation, and Ukraine: Antidumping Duty Orders*, 86 Fed. Reg. 47055, 47057 (Aug. 23, 2021).

[43] Slip Op. 23-150 at 9; Order at 1.

[44] Leading Views, USITC Pub. 5183 at 23.

Mexico in [      ] (Company B's) U.S. importer questionnaire response constituted the best available information on the record for measuring the volume of in-scope SSLPP from Mexico.[45]

We have further examined the Customs data in the record and find that they do not contradict our finding that [      ] (Company A) and [      ] (Company B) were the only known importers of in-scope imports of SSLPP from Germany and Mexico, respectively. The Customs data contain a list of companies that imported under HTS numbers that include both in-scope and out-of-scope products.[46] Therefore, the Customs data are overinclusive, encompassing imports of both in- and out-of-scope product. Given that the specific scope of these investigations does not align precisely with the HTS numbers, without an importer questionnaire or other company-specific information, it is impossible to discern from the Customs data whether the recorded imports are of in- or out-of-scope product. Therefore, the Customs data are not definitive in assessing whether or to what extent a particular company imported in-scope merchandise.

For this reason, the Commission set a priority in these investigations on obtaining and relying on importer questionnaire responses where possible. In those questionnaires, the Commission provided a definition of in-scope SSLPP that was aligned with the scope of the investigations, and asked importers to break out data on in-scope imports and on out-of-scope imports they imported under any of the HTS numbers referenced in Commerce's scope.[47] As explained above and in our Leading Views, the only responding importer that reported in-scope

---

[45] Leading Views, USITC Pub. 5183 at 24 n.89.
[46] *See* Customs Data, EDIS Doc. 737959.
[47] *See* Blank Importer Questionnaire, EDIS Doc. at 729228.

imports from Germany was [        ] (Company A).  Likewise, the only responding importer that reported in-scope imports from Mexico was [      ] (Company B).

We acknowledge that the Customs data show there are other companies that imported from Germany and Mexico in the overinclusive HTS categories,[48] but because no importer questionnaires were received by these other companies, there is no evidence that these companies imported in-scope merchandise.  Additionally, no purchaser questionnaire identified any of these companies as one of their top five suppliers of in-scope SSLPP in 2020, which includes six months of the negligibility period.[49]

Instead TMK simply pulled out *all* companies and *all* imports from the overinclusive Customs data for *all* of 2019 that are listed as importing under the HTS numbers from Germany and Mexico and asserted that all of these imports should be considered in-scope unless shown otherwise.[50]  However, many of the companies on TMK's compiled list of importers from Germany and Mexico did not import during the negligibility period – July 2019 through June

---

[48] Customs Data, EDIS Doc. 737959.
[49] [                                              ] Purchaser Questionnaire, EDIS Doc.733786 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733785 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733787 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733788 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733789 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733791 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.734927 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733793 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733794 at Q. II-4; [            s ] Purchaser Questionnaire, EDIS Doc.733796 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733798 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733800 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733801 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733802 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733805 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733806 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733807 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733808 at Q. II-4; [            ] Purchaser Questionnaire, EDIS Doc.733809 at Q. II-4.
[50] TMK's Remand Comments at Exhibits 1 and 2.

2020.[51] Moreover, as discussed above, the Customs data do not distinguish between in- and out-of-scope imports and therefore are not evidence contradicting the data the Commission did rely on—importer questionnaires of [      ] (Company A) and [      ] (Company B) reporting in-scope imports—to calculate the volume of in-scope imports from Germany and Mexico, respectively. Additionally, the list of other companies that TMK compiled from the Customs data and asserts imported in-scope product is contradicted by other record evidence. For example, as reflected in TMK's Exhibit 2, [            ] is listed as importing products from Mexico in the Customs data and yet [                  ], certified that it did not import any in-scope products during the POI.[52] Similarly, as reflected in TMK's Exhibit 1, the Customs data list [          ] as importing [      ] from Germany under TMK's "primary HTS numbers."[53] [      ] importer questionnaire response, however, certifies that it did not import any in-scope SSLPP at any time during the POI.[54]

Other information in the record also reinforces the Commission's reliance on the questionnaire responses of [      ] (Company A) and [      ] (Company B) to calculate imports from Germany and Mexico, respectively. In the case of Mexico, [      ] (Company B)

---

[51] TMK's Remand Comments at Exhibits 1 and 2; Customs Data, EDIS Doc. 737959.
[52] TMK's Remand Comments at Exhibit 2; [            ] Purchaser Questionnaire, EDIS Doc. 733802 at questions I-3, II-1. As noted above, Domestic Producers reply to TMK's argument that it made before the court that the Customs data included "purely subject SSLPP" HTS categories. *See* Domestic Producers' Remand Comments at 6-7. For the reason stated above, this argument by TMK similarly fails. In fact, TMK reported out-of-scope imports in its questionnaire response in nearly all HTS numbers listed in the scope of these investigations. Supplemental Staff Report, EDIS Doc. 738513 at S-14.
[53] TMK's Remand Comments at Exhibit 2.
[54] [            ] Importer Questionnaire, EDIS Doc. 731680.

13

was the [                                                    ] from Mexico.[55]  Based on the Customs data using the HTS numbers, [      ] (Company B) is by far the largest importer from Mexico, accounting for [    ] percent of total imports (combined in-scope and out-of-scope) from January 1, 2018 through November 30, 2019.  Given this prominence and that it is the only importer known to be importing in-scope SSLPP from Mexico, we find its reported volumes of in-scope imports to be representative and reasonable estimates of in-scope imports from Mexico.  We therefore continue to find that the import volumes reported by [      ] (Company B) are the best information available for estimating imports of in-scope merchandise from Mexico during the negligibility period.

With respect to imports from Germany, as explained in our Leading Views, [        ] (Company A) and [        ] (Company C) were the [                                    ] of merchandise from Germany in the Customs data (which as noted encompassed imports of both in- and out-of-scope product) and responded to the importer questionnaire.[56]  These two firms accounted for [    ] percent of total imports from Germany based on Customs

---

[55] Leading Views at 24 n.89.  Tenaris reported that "{its} [                                                                                          ]" and "{t}herefore, [                                                                                                                    ]."  Tenaris's Posthearing Br., EDIS Doc. 736731 at 8.  The record indicates that [      ] also produces out-of-scope product in addition to in-scope SSLPP product.  [      ] Importer Questionnaire, EDIS Doc. 735775 at II-3c, Customs Data, EDIS Doc. 737959.

[56] Leading Views, USITC Pub. 5183 at 23-24.  The court found the Commission did not act arbitrarily in relying on the initial importer questionnaires of [        ] and [        ] instead of the revised questionnaires.  Slip Op. 23-150 at 9-10.  TMK's efforts to relitigate this closed issue are unavailing.  See TMK's Remand Comments at 2, 5-6.  In any event, contrary to TMK's claim, the volume of in-scope and out-of-scope imports from Germany reported in [        ] and [        ] initial importer questionnaires do not exceed official import statistics.  [        ] initial importer questionnaire, EDIS Doc. 731482; [        ] initial importer questionnaire, EDIS Doc. 731687 at questions II-3a, II-3c, Official Import Statistics, EDIS Doc. 737965.

data for the entire range of HTS numbers.[57] Given that [      ] (Company C) reported that it did not import any in-scope imports during the POR,[58] and thus, [      ] (Company A) is the only importer known to be importing in-scope SSLPP from Germany, we find the in-scope imports reported by [      ] (Company A) in its importer questionnaire to be representative and a reasonable estimate of in-scope imports from Germany. We therefore continue to rely on the in-scope import volumes reported by [      ] (Company A) as the best information available for estimating imports of in-scope merchandise from Germany during the negligibility period.

We next respond to the court's instruction that the Commission "reconsider… its calculation of in-scope imports from Germany by [      ] (Company C) in view of evidence to the contrary proffered by TMK."[59] The evidence proffered by TMK included bill of lading documentation, Section 232 exclusion requests, and Customs data showing that [      ] (Company C) imported under a different antidumping duty order.[60]

The record shows that this evidence does not demonstrate that [      ] (Company C) imported in-scope merchandise. Nor does it undermine [      ] (Company C's) importer questionnaire response in which it attested that it did not import in-scope merchandise during the POI.[61] As TMK itself acknowledged, the Datamyne bill of lading documentation lacks detailed descriptions.[62] The Datamyne bill of lading documentation simply provides a short

---

[57] Customs Data, EDIS Doc. 737959.
[58] [      ] initial importer questionnaire, EDIS Doc. 731482.
[59] Order at 1-2.
[60] TMK's Remand Comments at 6-7.
[61] Slip Op. 23-150 at 9-11; [      ] initial importer questionnaire, EDIS Doc. 731482.
[62] TMK Posthearing Br. at 11.

15

description of [          ] (Company C's) imports and does not provide enough detail to determine whether its imports are within the scope, including whether the seamless pipe is less than 16 inches in diameter or meets one of the various exclusions.[63]

Likewise, the Section 232 exclusions documentation is limited to a list of [          ] (Company C's) Section 232 exclusion requests that were either filed or granted.  There is no evidence on the record concerning whether [        ] (Company C) actually imported those products or whether any importation occurred during the negligibility period.[64]

Lastly, TMK claims that [        ] (Company C) imported in-scope SSLPP from Germany because it contends [        ] (Company C) paid duties under an antidumping duty order on *SD SSLP from Germany*—as shown in the Customs data.[65]  The Customs data indicate that [          ] (Company C's) imports were subject to Initial Trade Remedy Collections, but there is no indication whether [        ] (Company C) paid duties under the *SD SSLP from Germany* order or a different trade measure, such as an order on other products.[66]  Even assuming that

---

[63] TMK Posthearing Br. at Exh. 2.1.  We have reviewed the two entries that TMK pointed to in its posthearing brief, TMK Posthearing Br. at 11, and find that this evidence does not undermine [        ] (Company C's) sworn attestation that it did not import any in-scope products from Germany.  The short description for these two entries in the bill of lading does not provide enough information to determine whether the products are in-scope or not.  Specifically, it does not contain any information regarding [                                                                    ].
[64] TMK Posthearing Br. at Exh. 3.1.
[65] TMK's Remand Comments at 6 and Exh. 3.
[66] [        ] imported products subject to Initial Trade Remedy Collections were limited to two HTS numbers:  7304.31.6050 and 7304.51.5060.  Customs Data, EDIS Doc. 737959.  We note that imports of cold-drawn mechanical tubing ("CDMT") from Germany also enter under these HTS numbers and are subject to antidumping duties under the *CDMT from Germany* order.  *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the People's Republic of China, the Federal Republic of Germany, India, Italy, the Republic of Korea, and Switzerland: Antidumping Duty Orders; and Amended Final Determinations of Sales at Less Than Fair Value for the People's Republic of China and Switzerland*, 83 Fed. Reg. 26962, 26966 (Jun. 2018).  The *CDMT from Germany* scope does not completely overlap nor

[          ] (Company C) paid duties under the *SD SSLP from Germany* order, TMK's argument is premised on the scope of the *SD SSLP from Germany* order completely overlapping or being completely encompassed by the scope of the current investigations.  However, TMK failed to provide any information or analysis supporting this premise.[67]  On its face, the premise is not factually correct, given that the *SD SSLP from Germany* scope does not completely overlap nor is it completely encompassed by the SSLPP scope applicable here, as the two scopes have different exclusions for ASTM standards, end uses, and hollow profiles.[68]  Given this, the Customs data do not demonstrate that [          ] (Company C) imported in-scope imports.  Thus, the evidence proffered by TMK does not contradict the Commission's finding that [          ] (Company A) imported the only known in-scope imports from Germany during the negligibility period.

In light of the above, we continue to rely on [          ] (Company A) and [          ] (Company B's) reported in-scope imports as the best information available for estimating in-scope SSLPP imports from Germany and Mexico, respectively.  We have added these volumes to the most reasonable available estimates for each other source, as sustained by the court, to arrive at the denominator for our negligibility calculation.  During the 12-month period prior to

---

is it completely encompassed by the SSLPP scope of the current investigations, given that the SSLPP scope excludes mechanical tubing with limited exceptions.  CR at I-9.

[67] *See generally* TMK's Remand Comments.

[68] For example, the *SD SSLP from Germany* scope includes ASTM A-335 while the scope of the SSLPP investigations specifically exclude ASTM A-335; the excluded products vary between the two investigations, namely, the *SD SSLP from Germany* scope includes condenser and heat exchanges pipe and tube products, while the scope of SSLPP investigations excludes condenser and heat exchanges pipe and tube (with certain exceptions); and the *SD SSLP from Germany* scope excludes hollow profiles used in the production of cold-drawn pipe and tube while the scope of the SSLPP investigations includes hollow profiles.  *Compare* CR at I-9-10 to *Certain Small Diameter Seamless Carbon and Alloy Standard, Line and Pressure Pipe From Germany: Continuation of Antidumping Duty Order*, 88 Fed. Reg. 57416, 57417 (Aug. 23, 2023).

the filing of the petitions (July 2019 through June 2020), subject imports of SSLPP from Russia accounted for [ ] percent of total imports.[69] Subject imports from Russia, thus, were not less than the three percent individual statutory negligibility threshold, and accordingly, we find that the subject imports from Russia are not negligible.

Having found that subject imports from Russia are not negligible, we adopt and incorporate in their entirety all other aspects and analyses set out in our Leading Views and Trailing Views.

**IV.   CONCLUSION**

For the foregoing reasons, we again determine that an industry in the United States is materially injured by reason of subject imports of SSLPP from Russia found by Commerce to be sold in the United States at LTFV and subsidized by the government of Russia.

---

[69] Supplemental CR/PR at Table I-6.  The volume of imports subject to the countervailing duty investigation and corresponding antidumping duty investigation for Russia is the same.